**Joyce A. Kandlbinder PAYNE, et al.,**
**Plaintiffs-Appellees,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 82–1741.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 19, 1983.

Decided June 29, 1983.

Robert L. Simpkins, Asst. U.S. Atty., Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for defendant-appellant.

Charles I. Weitzman, Granite City, Ill., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and ASPEN, District Judge.*

ASPEN, District Judge.

Appellees brought this action for damages against the United States of America ("government") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, alleging that the death of their husband and father, James H. Kandlbinder ("Kandlbinder"), resulted from negligent medical treatment at the John Cochran Veterans Administration Hospital ("Cochran V.A.") in St. Louis, Missouri.

Pursuant to 28 U.S.C. § 636(c), the parties agreed to have their case tried before a magistrate. After a nonjury trial, the magistrate entered judgment against the government in the amount of $170,690.00. In this proceeding, the government challenges three of the magistrate's findings of

---

* The Honorable Marvin E. Aspen, United States District Judge for the Northern District of Illi-   nois, is sitting by designation.

fact as clearly erroneous. In light of the record as a whole, we conclude that the challenged findings were not clearly erroneous and therefore affirm the magistrate's order.

### I.

Kandlbinder served in the United States Air Force from 1961 to 1966. During his service, he suffered from and was treated for chronic abdominal pain. In 1961, he spent five days in the Air Force hospital at Bunker Hill Air Force Base, Indiana. His problem was diagnosed as acute gastritis, type and cause undetermined. In October, 1964, an Air Force physician treated him for peptic ulcer disease. Kandlbinder was then hospitalized in November, 1964, for treatment of a duodenal ulcer. He was placed on a Sippy diet[1] and released after 27 days as asymptomatic.

Kandlbinder continued to experience intermittent epigastric pain. Pain relievers and antacids were prescribed by Air Force physicians in December, 1964, and February, 1965. In February, 1965, an upper gastrointestinal tract x-ray ("upper G.I.") indicated that the duodenal ulcer was smaller but still active. Pain relievers and antacids were again prescribed in May, 1965. An upper G.I. in August, 1965, showed no active duodenal ulcer.

Before Kandlbinder was discharged from the Air Force in May, 1966, a separation examination was performed by an Air Force physician. The upper G.I. then taken was negative for an active ulcer and showed scarring from a healed ulcer. The physician's report noted that Kandlbinder continued to experience epigastric pain relieved by antacids. In June, 1966, Kandlbinder was granted a service-related disability due to his ulcer condition. The disability report noted that Kandlbinder complained of pains in the mid-lower epigastric region with cramps after meals. A second disability evaluation was performed in De-

cember, 1966. The disability was reaffirmed and epigastric cramps again noted.

In March, 1967, Kandlbinder began outpatient treatment at Cochran V.A. At his first examination, the physician noted Kandlbinder's history of duodenal ulcer and his use of antacids. An upper G.I. was performed in April, 1967. The test showed no evidence of an ulcer niche and indicated that the duodenal bulb, loop and small bowel were normal. No other diagnostic tests were performed. Pain relievers were again prescribed.

On November 11, 1971, a disability examination was performed at another St. Louis V.A. hospital. The examining physician's report noted that Kandlbinder was not under the care of a licensed medical doctor, but was being treated at Cochran V.A. The report mentioned that Kandlbinder experienced minor attacks of abdominal pain for which he took antacids. An upper G.I. demonstrated no ulcer crater but showed a minimally deformed duodenal bulb.

Kandlbinder made approximately 30 visits to Cochran V.A. through October, 1973. The physicians frequently prescribed antacids and somewhat less frequently prescribed pain relievers and anti-anxiety medication. Although few entries from the physicians' records described Kandlbinder's complaints and symptoms, a number indicated that he was "improving" or "doing well." Dramamine was prescribed at one point for nausea during flight. A second upper G.I. was performed in May, 1973. No abnormalities were found.

Kandlbinder made his final visit to Cochran V.A. in October, 1973. The physician noted that Kandlbinder experienced belching after meals and felt he had excess stomach acid. No diagnostic tests other than the two upper G.I.'s of April, 1967, and May, 1973, were performed at Cochran V.A.

On June 6, 1977, Kandlbinder was admitted to St. Francis Mercy Hospital in Washington, Missouri, complaining of acute abdominal pain. Kandlbinder died on June 8,

---

1. The Sippy diet is a regimen of frequent feedings and alkalies used in the treatment of peptic ulcer disease.

1977. The cause of death as discerned by autopsy was hemorrhagic pancreatis resulting from cholelithiasis, *i.e.,* gallstone(s) blocking a pancreatic duct. The autopsy revealed the presence of at least 50 gallstones in Kandlbinder's gall bladder.

## II.

The magistrate concluded that as a matter of law,[2] the physicians who treated Kandlbinder at Cochran V.A. failed to exercise the appropriate degree of skill and learning in diagnosing and treating Kandlbinder's condition.[3] The government challenges three findings of fact that contributed to the magistrate's conclusion of negligence:

1. That Kandlbinder had gall bladder disease during the course of his treatment at Cochran V.A. (Finding of Fact 17).
2. That Kandlbinder exhibited symptoms of gall bladder disease while being treated at Cochran V.A. (Finding of Fact 17).
3. That Cochran V.A. physicians deviated from acceptable standards of medical care by failing to perform tests and diagnostic procedures that would have determined whether Kandlbinder had gall bladder disease. (Finding of Fact 16).

A trial court's findings may not be set aside unless this Court concludes that they are clearly erroneous. Fed.R.Civ.P. 52(a); *United States v. United States Gypsum Co.,* 333 U.S. 364, 394, 68 S.Ct. 525, 541, 92 L.Ed.

746 (1948); *Aunt Mid, Inc. v. Fjell-Oranje Lines,* 458 F.2d 712, 716 (7th Cir.1972), *cert. denied,* 409 U.S. 877, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972). Upon review of the record, we conclude that there is sufficient evidence to support the magistrate's findings and to preclude a holding by this Court that the findings were clearly erroneous.

The testimony of four expert witnesses was presented at trial: Dr. Dilip Banarjee, who treated Kandlbinder immediately before his death at St. Francis Mercy Hospital; Dr. Darrell Fort, who was deposed as the government's expert; Dr. Joseph Sapala, who was deposed as the plaintiffs' expert; and Dr. Robert Scheff, a St. Louis physician called by the court as its own expert.[4]

Dr. Banarjee testified, *inter alia,* that it was "highly probable" that Kandlbinder had gall bladder disease and stones during the period he was treated at Cochran V.A., i.e., 1967–1973. He indicated that when the upper G.I.'s were normal in the face of continued abdominal pain, the "common standard practice" would have been to have "looked into" other possible problems.[5]

Dr. Scheff testified, *inter alia,* that, based upon a reasonable degree of certainty, Kandlbinder "probably" had gallstones during his treatment at Cochran V.A. In his opinion, tests other than upper G.I.'s should have been performed, including an x-ray of the gall bladder. Dr. Scheff noted that the physicians' records from Cochran V.A. were not at all thorough and did not explain the

---

**2.** It is not disputed that Missouri law governs the issue of liability in this case. *Doss v. United States,* 476 F.Supp. 630, 632 (E.D.Mo.1979), *aff'd,* 624 F.2d 1109 (8th Cir.1980) (remanded on the issue of damages). Under Missouri law, a physician is negligent when he fails to "use and exercise that degree of care, skill, and proficiency which is commonly exercised by the ordinarily skillful, careful, and prudent physician and surgeon engaged in similar practice under the same or similar conditions." *Fisher v. Wilkinson,* 382 S.W.2d 627, 630 (Mo.1964).

**3.** The magistrate concluded, *inter alia:*
  [The physicians] failed to adequately record the deceased's complaints, history and symptomology and report the findings of their physical examinations. They failed to engage in basic testing. They failed to order

tests which would have ruled out gall bladder disease when the history and symptomology of their patient indicated such testing was necessary.
  Order of Magistrate, Conclusions of Law, p. 11 (March 4, 1982).

**4.** Plaintiffs introduced Dr. Banarjee's testimony at trial in the form of a videotaped deposition. Dr. Scheff was called by the magistrate as a live witness at trial. Dr. Fort's testimony was introduced by the government in the form of a video-taped deposition. The deposition of Dr. Sapala was read into the record by the government. Dr. Sapala was then called by plaintiffs as a live rebuttal witness at trial.

**5.** Deposition of Dr. Dilip Banarjee, p. 21.

actions taken by the physicians, *e.g.,* upper G.I.'s and prescriptions of antacids and pain relievers.[6]

Dr. Fort testified, *inter alia,* that in his opinion, Kandlbinder had only peptic ulcer disease during the period of his visits to Cochran V.A. and responded to proper treatment.[7]

Dr. Sapala testified, *inter alia,* that Kandlbinder "probably" had gallstones from 1966 until his death. In his opinion, the Cochran V.A. physicians failed to exercise proper medical judgment in not performing a series of tests or ultra sound on the gall bladder. Dr. Sapala testified that "99 percent" of all physicians would have automatically ordered gall bladder tests when ordering an upper G.I.[8]

Despite some testimony contrary to the challenged findings, numerous statements of the expert witnesses support each of the magistrate's contested findings. *United States Gypsum, supra,* 333 U.S. at 394, 68 S.Ct. at 541. The magistrate was able to observe the demeanor of Dr. Scheff and Dr. Sapala in person, and to observe Dr. Banarjee and Dr. Fort by way of video-taped deposition. We are required to defer to the credibility assessments made by the trier of fact. Given the testimony presented at trial, his findings were not clearly erroneous.

The government contends, nonetheless, that a finding that Kandlbinder had gall bladder disease can only be based upon speculation and therefore must be set aside. Specifically, the government suggested at oral argument that since no gall bladder test was performed on Kandlbinder during the course of his treatment at Cochran V.A., it is now impossible to determine with requisite certainty whether he in fact had gall bladder disease at that time. In effect, the government would have us decide that Cochran V.A.'s *negligence in not running a gall bladder series* on Kandlbinder should now shield it from a finding of *negligence for its failure to treat him for gall bladder disease.* The government reasons that ab-

sent testing at time of treatment, gall bladder disease could not have been diagnosed with absolute certainty and, therefore, it would be speculative to conclude at this point in time that he had the disease when treated.

We find this argument disingenuous. It is true that there is no way of ascertaining at this point that had a gall bladder series been run, the disease would have been discovered in Kandlbinder during the period of his treatment at Cochran V.A. However, the very reason speculation is now necessary is that the Cochran V.A. physicians failed to perform basic diagnostic tests. Thus, Cochran V.A.'s negligence in failing to test Kandlbinder for gall bladder disease is not contrary to, but in fact is supportive of, the magistrate's finding that Kandlbinder's treatment at the hospital was performed negligently. If the government's contention were accepted, liability for the results of inadequate medical testing would always be avoided.

For these reasons, we conclude that the challenged findings were not clearly erroneous. Affirmed.

---

**6.** Testimony of Dr. Robert J. Scheff, pp. 31, 34, 47, 66, 80.

**7.** Deposition of Dr. Darrell Fort, p. 19.

**8.** Rebuttal Testimony of Dr. Joseph Sapala, pp. 2, 9.